

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
03/20/2017

| | | |
|---|---|---|
| IN RE: | § | |
| MELANIE MILLER ANDERSON; aka | § | CASE NO: 15-33603 |
| ANDERSON; aka MILLER | § | |
|     Debtor(s) | § | |
| | § | CHAPTER  13 |
| | § | |
| MELANIE MILLER ANDERSON | § | |
|     Plaintiff(s) | § | |
| | § | |
| VS. | § | ADVERSARY NO. 15-3290 |
| | § | |
| DANIEL  SAXTON, *et al* | § | |
|     Defendant(s) | § | |

<u>**MEMORANDUM OPINION**</u>

On October 26, 2015, Melanie Miller Anderson initiated this lawsuit against several defendants, including David McKeand.  (ECF No. 1).  As a result of an approved settlement, McKeand is the only remaining defendant in this adversary proceeding.  (Case No. 15-33603 at ECF No. 77).  The settlement compensated Anderson for the actual damages she sought in this case, but it did not satisfy costs she incurred or attorney's fees sufficient to compensate her counsel.  Anderson seeks to recover costs and attorney's fees from McKeand.  In her complaint, Anderson alleges that the J. Freeman Law Firm was a Debt Relief Agency as defined by 11 U.S.C. § 101(12A) of the Bankruptcy Code, and further, that McKeand directed the firm to operate in violation of the requirements for Debt Relief Agencies set forth in §§ 526–528 of the Bankruptcy Code.  (ECF No. 12 at 7-10).  Prior to trial, the Court denied McKeand's motion for summary judgment and his demand for a jury trial.  (ECF Nos. 62 and 50).  On November 30, 2016, the Court held a trial.  For the reasons set forth herein, Anderson has established McKeand's individual liability for violations of the Bankruptcy Code.

**Jurisdiction and Authority**

This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1334.  While claims under 11 U.S.C. §§ 526–528 are not enumerated core proceedings under 28 U.S.C. § 157, they invoke substantive rights established by the Bankruptcy Code.  *In re Morrison*, 555 F.3d 473, 479 (5th Cir. 2009) ("Core proceedings are those that invoke a substantive right provided by title 11") (internal quotations omitted); *In re Harrelson*, 537 B.R. 16, 27 (M.D. Ala. 2015); *In re Kohlenberg*, 2012 WL 3292854 (N.D. Ohio Aug. 10, 2012).  Accordingly, the Court has authority to issue a final judgment in this case.

**Procedural Background**

This adversary proceeding was litigated contemporaneously with a related miscellaneous proceeding.  (*See* Case No. 15-307).  The miscellaneous proceeding originated from an order requiring certain individuals affiliated with the J. Freeman Law Firm to appear and show cause why the firm should not be sanctioned for violations of the Bankruptcy Code.  (*Id.*, ECF Nos. 1, 20).  Initially, the show cause order pertained only to Natasha Bascus, a bankruptcy petition preparer who obtained all of her clients by referral from the J. Freeman Law Firm.  (*Id.* at 1).  However, a second show cause order was issued based on testimony from Bascus's hearing that gave rise to potential violations of the Bankruptcy Code by the J. Freeman Law Firm.  (*Id.* at 20).  McKeand was among the individuals ordered to appear and show cause.

The United States Trustee filed a motion requesting that certain bankruptcy cases filed by clients of the J. Freeman Law Firm be included in the miscellaneous proceeding.  (Case No. 15-307, ECF No. 43).  The U.S. Trustee sought to include these cases in order to distribute any sanctions awarded in the miscellaneous proceeding to debtors whose cases were affected by the J. Freeman Law Firm.  (*Id.*).  Anderson's case was designated for inclusion in the U.S. Trustee's

motion. However, Anderson opposed consolidation and opted to pursue her case independently. (Case No. 15-307, ECF No. 45). The Court ordered that hearings in Anderson's adversary proceeding would be jointly held with the hearings in the miscellaneous proceeding, but that Anderson's proceeding would not be substantively consolidated with the U.S. Trustee's Motion. (Case No. 15-307, ECF No. 63). Evidence was introduced at the joint hearings prior to the trial in this adversary proceeding that bears on whether the J. Freeman Law Firm was a Debt Relief Agency engaged in conduct that violated §§ 526–528 of the Bankruptcy Code and on whether McKeand was the individual who directed the violating conduct. The evidence admitted at these pretrial hearings is part of the record in this adversary proceeding.

**Analysis**

### I.    Personal Liability

The Court will first address McKeand's renewed argument that even if the conduct of the J. Freeman Law Firm vis-à-vis Anderson qualified it as a Debt Relief Agency, McKeand is not individually liable to Anderson for any violations of §§ 526–528 because he is protected by the corporate shield under applicable law. This argument was first raised in McKeand's denied motion for summary judgment. The Court issued a Memorandum Opinion at ECF No. 61 in which it set forth its reasoning for denying McKeand's motion. Because this issue represents the heart of McKeand's defense to liability, the Court will explain its reasoning in greater detail.

Generally, a corporate officer's acts on the corporation's behalf are deemed to be acts of the corporation. *See Leitch v. Hornsby*, 935 S.W.2d 114, 117-18 (Tex. 1996). Accordingly, the corporate shield may protect an officer from personal liability for actions taken on behalf of the corporation. For example, if a corporate officer takes action that results in a breach of a corporate contract, the acting officer is likely not individually liable for any resulting damages.

*See ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 432 (Tex. 1997).  Nevertheless, there are at least two scenarios in which a corporate officer may be personally liable for corporate conduct.

   *a. A corporate officer may be individually liable for his own wrongful conduct*

   The first scenario occurs when a corporate officer *personally* engages in wrongful conduct, even conduct that is within the scope of his employment.  A classic example of this is a corporate officer who negligently causes an automobile accident while driving within the scope of his employment.  *See Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596–97 (Tex. 1987).  The officer is personally liable for his own negligent conduct because he owes an independent duty of care to the public to drive in a non-negligent manner.  *Id.*; *Leitch,* 935 S.W.2d at 117.  The most established type of wrongful conduct for which a corporate officer may be personally liable is tortious conduct.  *See e.g.*, *Citronelle-Mobile Gathering, Inc. v. Herrington*, 826 F.2d 16, 25 (Temp. Emer. Ct. App. 1987) (noting "the parallel between conduct which violates general principles of tort law, and conduct which infringes rights secured by statutes").  Nevertheless, "personal liability of corporate personnel need not be dependent upon establishing the elements of common law torts." *Id.*

   A corporate officer who personally violates a statute or regulation may also be individually liable.  *Weitzel v. Barnes*, 691 S.W.2d 598 (Tex. 1985).  In *Weitzel*, the Texas Supreme Court found two corporate officers individually liable for making representations that violated the Texas DTPA, even though they made the representations within the scope of their employment.  691 S.W.2d at 601.  The crucial element of this first scenario is the requirement that the corporate officer personally engage in the wrongful conduct, whether it be tortious or in violation of a statute.  *See Glen W. Light v. J.M. Wilson*, 663, S.W.2d 813 (Tex. 1983).  In *Light*,

the Texas Supreme Court held that absent piercing the corporate veil, a corporate officer is not individually liable for an agent's statutory violations.  *Id.* at 814-15; *See also Commercial Escrow Co. v. Rockport Rebel Inc.*, 778 S.W. 2d 532, 541 (Tex. App.—Corpus Christi 1989, writ denied) ("It is not necessary that the 'corporate veil' be pierced in order to impose personal liability, as long as it is shown that the corporate officer knowingly participated in the wrongdoing").  Though *Light* preceded *Weitzel*, the cases are consistent insofar as they stand for the proposition that a corporate officer may be held individually liable for his own wrongful conduct.

> b.  *A corporate officer may individually liable if he is the "guiding spirit" behind the wrongful conduct.*

The second scenario is related to the first, but is sufficiently distinct to warrant independent analysis.  Some courts[1] have applied what has been termed the "guiding spirit" approach to determine whether a corporate officer may be held to be individually liable.  This approach is designed to address the situation where a corporate officer directs a corporate agent to engage in wrongful conduct, but the officer does not personally engage in the wrongful conduct.  *Ennis v. Loiseau*, 164 S.W.3d 698, 707–08 (Tex. App. 2005) (citing *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985))("[a] corporate officer may not escape liability where he had direct, personal participation in the wrongdoing, as to be the 'guiding spirit' behind the wrongful conduct or the 'central figure' in the challenged corporate activity.").

---

[1] The "guiding spirit" approach to determine a corporate officer's individual liability for an agent's wrongful conduct has been adopted primarily by federal courts applying Texas law.  Texas courts that have considered the "guiding spirit" approach have done so primarily to determine whether a corporate officer is subject to jurisdiction in Texas.  *See Cox v. State*, 448 S.W.3d 497, 502-03 (Tex. App.—Amarillo 2014, pet. denied) (discussing the "guiding spirit" approach and its applicability to determining the individual liability of a corporate officer for their agent's wrongful conduct).  The Court finds that the "guiding spirit" approach to determine an officer's individual liability for his agent's wrongful conduct is a logical and valid extension of determining individual liability for an officer's own wrongful conduct.  Both approaches determine individual liability for an officer's *own* wrongful conduct—whether it is performed by the officer himself, or he directs it to be performed by an agent.

When directors and officers authorize the commission of wrongful acts that are prohibited by statute, even if the acts are done on behalf of the corporation, they may be held personally liable. *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001); *Citronelle-Mobile*, 826 F.2d at 25 ("[P]ersonal responsibility for corporate liability may attach when the individual's wrongful conduct causes the violation of a statute [or] accompanying regulations . . ."). In *American Blastfax*, the officers of a corporation which failed to disclose that its sale of unsolicited facsimile advertisements was unlawful, in violation of the Texas DTPA and the Telephone Consumer Protection Act, were personally liable for statutory damages because the officers actively oversaw and directed the conduct that violated the statute. *American Blastfax*, 164 F. Supp. 2d at 898. The court concluded that to hold otherwise would allow the individual defendants to simply dissolve the violating corporation, set up a new corporation, and repeat the unlawful conduct. *Id.*

      *c.  Conclusion*

As the Court stated in its Memorandum Opinion denying summary judgment in favor of McKeand, the evidence does not demonstrate that McKeand personally engaged in conduct that violated §§ 526–528 of the Bankruptcy Code. Instead, Anderson is relying on the "guiding spirit" approach to establish McKeand's individual liability. Anderson alleges that McKeand controlled the J. Freeman Law Firm and directed it to operate in violation of the Bankruptcy Code. Anderson alleges that in so doing, McKeand is personally liable to Anderson for violations of the Code. As set forth above, if Anderson can demonstrate that the J. Freeman Law Firm violated the Bankruptcy Code in its dealings with Anderson, and that McKeand was a "guiding spirit" behind its violating conduct, McKeand may be individually liable to Anderson.

## II.    Conduct of the J. Freeman Law Firm

### a.   11 U.S.C. §§ 526, 527, and 528

Under the Bankruptcy Code, the term Debt Relief Agency "means any person who provides any bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration . . . ." 11 U.S.C. § 101(12A).  Bankruptcy Assistance "means any goods or services sold or otherwise provided to an assisted person with the express or implied purpose of providing information, advice, counsel, document preparation, or filing . . . with respect to a case or proceeding under this title.  11 U.S.C. § 101(4A).  An Assisted Person "means any persons whose debts consist primarily of consumer debt and the value of whose nonexempt property is less than $186,825." 11 U.S.C. § 101(3).  Sections 526–528 of the Code set forth the restrictions, disclosures, and requirements of debt relief agencies.  11 U.S.C. §§ 526–528.    Failure to satisfy the requirements of §§ 526–528 voids any contract for bankruptcy assistance between the Debt Relief Agency and the Assisted Person, and makes the Debt Relief Agency liable to the Assisted Person for certain amounts.  Section 526 states:

> (c)(2) Any debt relief agency shall be liable to an assisted person in the amount of any fees or charges in connection with providing bankruptcy assistance to such person that such debt relief agency has received for actual damages, and for reasonable attorneys' fees and costs if such agency is found, after notice and a hearing, to have
>
> > (A) intentionally or negligently failed to comply with any provision of this section, section 527, or section 528 with respect to a case or proceeding under this title for such assisted person.

### b.   Testimony of Melanie Anderson

At the trial on November 30, 2016, Anderson testified about her interaction with the J. Freeman Law Firm.  She testified that she initially contacted the J. Freeman Law Firm to obtain a mortgage modification to save her home from foreclosure.  She communicated with Kirk

Martells who informed her that there was not sufficient time for her to qualify for a mortgage modification, and that her only option was to file bankruptcy in order to "buy time" to obtain a mortgage modification.   In response to an email from Martells on July 3, 2015, in which he requested a retainer fee from Anderson, Anderson remitted $1,200.00 to the J. Freeman Law Firm.  (Ex. 6).  On July 7, 2015, the J. Freeman Law Firm sent Anderson a letter advising her of three options: (1) "Do nothing and wait until for (sic) your lender's response to our demand that they suspend the sale on your property"; (2) "Hire a bankruptcy attorney to pursue your options in bankruptcy"; and (3) "You also have a right to file a bankruptcy pro se . . . . Some people are able to successfully file on their own or with the help of a bankruptcy petition preparer at a minimal cost.  If you are interested in this option we can provide the names of petition preparers who work in your area and can help you with the paperwork." (Ex. 7).

It is undisputed that the J. Freeman Law Firm engaged in the conduct set forth in the preceding paragraph.

Anderson chose the third option and testified that the J. Freeman Law Firm referred her to a bankruptcy petition preparer named Natasha Bascus.  Ultimately, Anderson paid Bascus $150.00 to assist her in filing a Chapter 13 bankruptcy case.  Anderson testified that Bascus independently made the determination that Anderson should file a Chapter 13 case and that Anderson's debts were primarily consumer debts.[2]

    c.   *Testimony of Natasha Bascus*

On April 6, 2016, Natasha Bascus testified before this Court.  Bascus testified that she received prospective debtor's names and contact information (including Anderson's name and contact information) from the J. Freeman Law Firm, and that she would contact these individuals

---

[2] All issues with respect to Bascus's compliance with the Bankruptcy Code have been resolved in another proceeding.

in order to assist them in filing Chapter 13 cases. (Case No. 15-307, ECF No. 148 at 25). Bascus testified that she exclusively filed Chapter 13 cases, but stated that she did not instruct debtors under which chapter to file their case. (*Id.* at 27). Bascus's only source of clients were those referred to her by the J. Freeman Law Firm. (Ex. 46 at 20).

> ### d. Conclusion

The testimony of Anderson and Bascus, along with the "three option" letter Anderson received, conclusively establishes the J. Freeman Law Firm's status as a Debt Relief Agency as defined in § 101(12A) of the Bankruptcy Code. At a minimum, the letter the firm sent to Anderson constitutes bankruptcy assistance because it was sent with the purpose of providing legal advice with respect to filing a bankruptcy case. *See* 11 U.S.C. § 101(4A)[3]. The J. Freeman Law Firm provided bankruptcy assistance to Anderson in return for the payment of $1,200.00. As a Debt Relief Agency, the J. Freeman Law Firm must comply with §§ 526–528 of the Bankruptcy Code. It is undisputed that the J. Freeman Law Firm did not comply with §§ 526–528. Among other things, the J. Freeman Law Firm (1) failed to provide written notice giving Anderson a brief description of the various bankruptcy options that an individual may elect, as required by § 527(a)(1), (2) failed to inform Anderson of available credit counseling services, as required by § 527(a)(2), (3) failed to inform Anderson of the obligation to provide information that is complete accurate and truthful, as required by § 527(a)(2), (4) failed to inform Anderson of the duty to disclose all assets and liabilities as required by s 527(a)(3), (5) failed to give the contract and fee disclosures required by § 527(b) of the Bankruptcy Code, and (6) failed to make the advertising disclosures required by § 528(a)(3)-(4).

---

[3] McKeand alleges that the J. Freeman Law Firm's contract with Anderson disclaims the provision of bankruptcy advice. The Court has repeatedly held that such a mendacious disclaimer is ineffective when it is contrary to the actual facts of the representation. Additional details are set forth below.

The J. Freeman Law Firm's course of conduct with Anderson was not an isolated incident.  As the Court found in the miscellaneous proceeding, the J. Freeman Law Firm would routinely accept clients at times when it was far too late to avoid a foreclosure through negotiation, take a substantial down payment, and then encourage them to immediately commence a bankruptcy case to invoke the automatic stay.  The firm went so far as to recruit bankruptcy petition preparers who worked exclusively with them for the purpose of obtaining emergency bankruptcy relief for their clients.  The petitions prepared by the J. Freeman Law Firm's preparers were consistently deficient and the cases were dismissed almost immediately. Despite holding itself out as a law firm, clients would rarely, if ever, speak with an attorney.

In 2011, the Federal Trade Commission issued a rule governing Mortgage Assistance Relief Services (the "MARS Rule").  Under the MARS Rule, a firm may not collect fees for providing mortgage assistance until it has successfully obtained mortgage relief on behalf of a client.  *See* 12 C.F.R. § 1015.5.  There is a narrow exception to the prohibition against advanced fee collection.  A law firm may collect advance fees under certain circumstances.  *See id.* at § 1015.7.  The evidence in this case reflects that the J. Freeman Law Firm decided to extend the law firm status to a firm conducting mortgage relief services (R.A. Support Services) in order to collect fees in advance of obtaining mortgage relief and retain the fees even if no mortgage relief was achieved.  (Case No. 15-307, ECF No. 111 at 3).

This strategy proved difficult to maintain.  The uncontested evidence demonstrated that many clients did not contract for mortgage relief services until hours or days before their home was scheduled for foreclosure.  The firm's training materials include a "Phone Presentation" that instructed employees on how to conduct initial and follow-up client contact.  Employees were instructed to gather intake information from the prospective client, and then inform the client that

the firm would present the information to an attorney for review.  Invariably, the firm agreed to take the case and collected a retainer, with no review by an attorney.  The standard phone presentation was designed to mislead prospective customers into believing that (i) an attorney would review their case, and (ii) clients were "accepted" on a selective basis.

The only defense raised by the Firm regarding its violations of the Bankruptcy Code was that its engagement agreement with clients specifically carved out bankruptcy services, and accordingly, all bankruptcy advice it gave was gratuitous.  In doing so, the Firm believed it could escape the advance payment prohibition for mortgage relief services under the MARS Rule by obtaining clients as a law firm while at the same time avoiding the Debt Relief Agency requirements of the Bankruptcy Code.  The Court rejected that argument citing the Texas Disciplinary Rules of Professional Conduct which dictate that a lawyer may not limit the scope of his representation if it impairs the lawyer's absolute duty to provide competent representation. (Case No. 15-307; ECF No. 111 at 9-10).  The Court found that a firm that provides mortgage relief services in the manner of the J. Freeman Law Firm cannot unreasonably limit the scope of its services to exclude advising a client regarding bankruptcy alternatives.  (*Id.*).

Because the Court concludes that the J. Freeman Law Firm operated as a Debt Relief Agency as to Anderson, and that it failed to comply with the requirements attendant to Debt Relief Agencies under the Bankruptcy Code, it must determine whether McKeand directed or otherwise acted as the "guiding spirit" behind the Law Firm's violating conduct.

## III.    McKeand's Role at the J. Freeman Law Firm.

### a.  *Testimony of David McKeand*

At trial on November 30, 2016, McKeand testified before this Court.  McKeand was a principal and one-half equity owner of the J. Freeman Law Firm.  (Ex. 24 at 195).  McKeand

stated that he was Kirk Martells' employer.  McKeand stated that he traveled to Atlanta, where the J. Freeman Law Firm offices were located, approximately once a month to talk about "things [the J. Freeman Law Firm] can do and can't do."  (Ex. 24 at 200; Ex. 35 at 291).  With respect to the J. Freeman Law Firm's compliance with the Bankruptcy Code and other applicable regulations, McKeand stated that "[he] looked at the statutes . . . went through the Federal Trade Commission stuff . . . looked at Debt Relief Agency and thought that we were in compliance." (Ex. 36 at 16).  McKeand acknowledged that the J. Freeman Law Firm, at times, instructed people to talk to a bankruptcy attorney and "maybe even sent them to a bankruptcy petition preparer," but stated that "all of that was gratuitous and none of it was allowed by [the J. Freeman Law Firm's] contract." McKeand stated that he became aware of the J. Freeman Law Firm's practice of sending the "three option" letter to its clients in 2014.  (Trial at 11:53).  In a previous case the Court concluded that the J. Freeman Law Firm was a Debt Relief Agency. After the Court made that determination, McKeand indicated that he would go back to Atlanta and instruct his employees regarding how to avoid future violations of the Code.  (Ex. 47 at 2). The implication of this statement is that McKeand had the authority to direct the practices and policies of the J. Freeman Law Firm.

> b. *Testimony of Jeff Lalo*

On April 6, 2016, Jeff Lalo testified before this Court.  Jeff Lalo was employed by R.A. Support Services, which provided staffing to the J. Freeman Law Firm.  (Case No. 15-307, ECF No. 149 at 211).  Lalo testified that his job at R.A. Support Services was to supervise the staff with respect to client interaction and case management.  (*Id.*).  Lalo was also responsible for reviewing staff performance and authorizing bonuses accordingly.  (*Id.*).  Lalo testified that Daniel Saxton, a partner in the J. Freeman Law Firm, also supervised the staff supplied by R.A.

Support Services.  (*Id.* at 210).  Lalo testified that Kirk Martells was an R.A. Support Services Employee.  (*Id.* at 213).  When asked about the management of the J. Freeman Law Firm and R.A. Support Services enterprise[4], Lalo testified that "a single person is not 'in charge' of any one thing . . . Dan [Saxton] is in charge of a lot of it.  [McKeand] has got a lot to do with it.  I handle certain areas. . . . I can't say there's a person in charge of everything." (*Id.* at 282).  Lalo stated that he had been in the business longer than both McKeand and Saxton.  (*Id.*).  Lalo stated that McKeand and Saxton, as partners of the J. Freeman Law Firm, had the authority to terminate his employment at will.  (*Id.* at 246).  Lalo had worked with McKeand for five years (*Id.* at 238).  Lalo described McKeand as "the attorney in Texas" and that if there was any judicial process, McKeand would do advisory work or courtroom work.  (*Id.* at 216, 218).  Lalo described McKeand's role at the firm as follows:

> [Mckeand] provides a lot of counsel, advice.  He intervenes on behalf of any Texas client that needs any sort of judicial work at all.  He's right now handling a couple of cases that are in the various courts, one in State Court, one is what we would in Georgia call Magistrate Court.  He's handled several cases in the past.  So whenever there is any legal work needed in Texas, he is involved, as well as, you know, day-to-day we probably talk, I mean, many, many times per month, sometimes many, many times per day.

(Case No. 15-307, ECF No. 148 at 238-39).

> c.  *Testimony of Daniel Saxton*

On April 13, 2016, Daniel Saxton testified before this Court.  Saxton was McKeand's partner at the J. Freeman Law Firm.  (Case No. 15-307, ECF No. 117 at 12).  Saxton testified that the firm provided mortgage relief services prior to his purchasing an equity interest.  Jeff Lalo managed the business prior to Saxton's arrival.  McKeand was also involved at the time

---

[4] The Court concludes that the distinction between R.A. Support Services and the J. Freeman Law Firm is murky at best.

Saxton purchased his interest.  (*Id.* at 18).  Saxton testified that Lalo made the determination whether legal work was required for an individual client's mortgage relief case.  (*Id.* at 18). Saxton testified that he personally signed the checks for the law firm to pay vendors, including Lalo's staffing company, R.A. Support Services.  (ECF No. 117 at 39).

> d.  *McKeand's role as principal of a law firm*

It is highly relevant that McKeand was a one-half equity owner of a law firm. Application of the guiding spirit approach to individual liability in a law firm setting raises unique considerations absent from other business enterprises.

The evidence demonstrates that the enterprise consisting of the J. Freeman Law Firm and R.A. Support Services was designed specifically to circumvent federal law.  *See* 12 C.F.R. § 1015.  If R.A. Support Services sought mortgage modifications on behalf of clients without being a law firm, it would be prohibited from accepting fees in advance of securing mortgage relief.  *Id.* at § 1015.5.  However, because McKeand and Saxton extended the "law firm" status to R.A. Support Services, the enterprise was permitted to take fees in advance of securing mortgage relief.  *Id.* at § 1015.7.

McKeand does not deny that the firm operated in the manner described in this opinion. Instead, he argues that he did not direct or control the policies or procedures of the Firm.  He makes this argument despite the fact that *it was his law firm*.  The Court is unsettled that a lawyer may grant a non-lawyer the credibility that comes with being a "law firm," but avoid personal liability for the non-lawyer's statutory violations so long as there are sufficient steps between the lawyer and the non-lawyer's violation to make the lawyer's nonparticipation in it a credible defense.  McKeand admits that by 2014 he was aware of his firm's practice of sending the "three

option" letter to clients.  Once McKeand became aware of the practice, there is no evidence that he took any steps to stop his firm's unlawful conduct.[5]

Texas and Georgia have substantially similar rules of professional conduct governing the responsibilities of lawyers regarding nonlawyer assistants.  The testimony of Jeff Lalo reflects that he was a nonlawyer employed by the J. Freeman Law Firm.  As such, McKeand and Saxton as partners of the J. Freeman Law Firm, and as direct supervisors of Lalo, had the responsibility to make reasonable efforts to ensure that the firm had in effect measures giving reasonable assurance that Lalo's (and other R.A. Support Services' employees') conduct was compatible with the professional obligations of the lawyers.  Ga. R. Prof. Conduct 5.3(a)-(b); Tex. Disciplinary R. Prof. Conduct 5.03(a).  Additionally, McKeand and Saxton may be personally responsible for Lalo's violations if they knew of the conduct at a time when its consequences could have been avoided or mitigated but failed to take reasonable remedial action.  Ga. R. Prof. Conduct 5.3(c)(2); Tex. Disciplinary R. Prof. Conduct 5.03(b)(2).

In addition to this plain violation of the Rules of Professional Conduct, the Court finds that the role attorneys occupy in society demands that they conduct themselves—and their law firms—in conformance with the law.  *Bray v. Squires*, 702 S.W.2d 266, 270 (Tex. App.—Houston [1st Dist.] 1985, no writ) ("Because of a lawyer's special position in society, even minor wrongdoing tends to lessen the public's confidence in the legal profession. Thus, a lawyer is expected to refrain from any conduct that creates the impression of dishonesty, fraud, or deceit."); *In re Johnson*, 996, S.W.2d 430, 435–36 (Tex. App.--Beaumont 1999, orig. proceeding) ("A lawyer's conduct should conform to the requirements of the law, both in

---

[5] Certain individuals related to R.A. Support Services and the J. Freeman Law Firm, including McKeand, have been previously admonished by several courts that the firm's practice puts it squarely within the definition of Debt Relief Agency.  (Case No. 15-307; ECF No. 111 at 7).  McKeand disagreed with the rulings of these courts, and the Firm continued to operate in violation of the Bankruptcy Code.

professional service to clients and in the lawyer's business and personal affairs."). The preamble of the Texas Disciplinary Rules of Professional Conduct confirms this duty:

> A lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice. Lawyers, as guardians of the law, play a vital role in the preservation of society. The fulfillment of his role requires an understanding by lawyers of their relationship with and function in our legal system. A consequent obligation of lawyers is to maintain the highest standards of ethical conduct.

Tex. Disciplinary R. Prof. Conduct Preamble ¶ 1.

As this Court previously found, many clients of the J. Freeman Law Firm never spoke with an attorney, though the name of the firm and all communications led them to believe they were engaged with lawyers for help with mortgage relief. It was the Firm's policy to provide these clients, including Anderson, with bankruptcy advice and to refer them to a petition preparer who would commence a bankruptcy that was destined for failure. McKeand, as a partner of the J. Freeman Law Firm, willfully ignored his duty as an attorney to ensure his firm operated in compliance with the law.

### e.  Conclusion

The testimony is clear that McKeand was involved in the leadership of the law firm and that he trained and consulted with the firm's employees regarding its procedures. Although the evidence does not reveal a "smoking gun" wherein McKeand instructed employees of the firm to advise clients regarding bankruptcy without complying with the Bankruptcy Code, no such "smoking gun" is required. McKeand's explanation that he was not involved in directing the firm's client procedures is not credible in light of the evidence, nor is it permissible under the duties established by the Disciplinary Rules of Professional Conduct.

Considering (1) the witness testimony regarding McKeand's role at the J. Freeman Law Firm, and (2) McKeand's duty as a partner of a law firm to ensure that his firm complied with

federal law, the Court finds that the Anderson has satisfied her burden to prove that McKeand actively oversaw and directed the violating conduct of the J. Freeman Law Firm.  Accordingly, McKeand is liable to Anderson for his firm's violations of the Bankruptcy Code.

### Damages

Section 526 allows recovery of actual damages and reasonable attorney's fees and costs. 11 U.S.C. § 526(c)(2).  Anderson previously was awarded $1,350.00 as part of the approved settlement with certain of the defendants in this case.  This amount included $1,200.00 she paid to the J. Freeman Law Firm as a retainer for mortgage relief services, and $150.00 she paid to Bascus to prepare her bankruptcy petition.

The evidence reflects that Anderson spent at least 6 hours traveling to and from court to attend hearings.  Anderson incurred a minimum of $6.00/day in parking expenses while attending court hearings.  Anderson may be compensated for her travel time at $20/hour and may be reimbursed for her parking expenses.  Absent evidence of lost wages, the Court may not award actual damages for the time Anderson spent attending hearings or otherwise prosecuting this case.  In total, Anderson is entitled to $138.00 in actual damages.

Anderson seeks $30,951.94 in attorney's fees and expenses.  In cases where certain defendants have settled, the plaintiff must segregate the fees owed by the remaining defendants from those owed by the settling defendants so that the remaining defendants are not charged fees for which they are not responsible.  *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11 (Tex. 1991).  Prior to the settlement with all defendants except McKeand, Walker & Patterson billed $40,730.00.  (ECF No. 72 at 8).  Walker & Patterson billed $1,470.00 for the preparation and prosecution of the motion to compromise.  The settlement included a payment to Anderson, of which $33,650.00 was remitted to Walker & Patterson for attorney's fees.  (*Id.*).  McKeand is

responsible for some portion of the pre-settlement fees but he is not responsible for the fees associated with the compromise agreement to which he did not participate. The Court finds that there were six defendants in this adversary proceeding, five individuals and one entity, the J. Freeman Law Firm.[6] All defendants but McKeand settled with Anderson. (ECF No. 34; Case No. 15-307, ECF No 180-1). Accordingly, the Court will allocate one-sixth of the pre-settlement attorney's fees minus the fee associated with the settlement ($6,543.33) to McKeand. Since the compromise, Walker & Patterson has billed $20,850.00 in attorney's fees. (ECF No 72 at 8). Because McKeand is the final remaining defendant in this case, these fees are sufficiently segregated to McKeand. Walker & Patterson incurred $1,204.74 in expenses attributable to McKeand. (ECF No. 72-4). Finally, Walker & Patterson billed $1,800.00 to prepare its declaration regarding fees.

McKeand argues that the attorney's fees and expenses requested by Anderson are unreasonable and should be denied because (1) they do not bear a reasonable relationship to the amount in controversy, (2) they were unnecessary, and (3) they were duplicative.

Although the amount in controversy can be a factor in determining reasonable attorney's fees, courts should use care before relying on this factor alone. "It is a simple fact in a lawyer's life that it takes about the same amount of time to collect a note in the amount of $1,000.00 as it takes to collect a note for $100,000.00." *In re Jensen*, 113 B.R 51, 55 (Bankr. D. Utah 1990). It is apparent that Anderson's actual damages in this case did not exceed the modest sum of $1,500.00. Nevertheless, it took over one year of highly contested litigation to achieve this resolution. Of the approximately 200 hours spent on this case, Walker & Patterson spent 55 hours litigating contested motions. Many of these motions resulted from McKeand's aggressive

---

[6] Though R.A. Support Services, Freeman Saxton, PC, and Jeffrey Freeman & Associates a/k/a the J. Freeman Law Firm were all named defendants, they are in fact one entity, the J. Freeman Law Firm.

litigation strategy.[7]  This is not meant to suggest that McKeand improperly pursued remedies to which he believed he was entitled, it is only to say that the expense of litigation can rise considerably when each stage of the process is bitterly contested.

Regarding the necessity of certain expenses Anderson's counsel incurred, McKeand objects specifically to $1,100.00 in expenses associated with creating copies for the exhibit binders used at trial.  (ECF No. 70 at 2; ECF No. 72 at 7).  The expenses incurred to create exhibit binders for trial were incurred pursuant to the Court's Local Rule 9013-2.  These expenses were not unnecessary.

Regarding duplicative fees, though his objection is unclear, the Court understands that McKeand objects to Walker & Patterson employing two attorneys at the hearings in this case. (ECF No. 70 at 1-2).  A total of 34.6 hours were billed as time spent in hearings.  (ECF No. 72 at 5).  Both Miriam Goott and Johnie Patterson of Walker & Patterson attended the hearings in this case.  (*Id*.).  Walker & Patterson assert that two attorneys were necessary because McKeand would routinely make oral motions at hearings without providing notice to Anderson. Sometimes his motions would require on the spot research in order to provide a response. Additionally, Goott was called as a witness in a hearing in response to an unnoticed motion to recuse the undersigned from this case.  The Court finds that it was not unreasonable for Walker & Patterson to employ two attorneys for hearings in this case.

McKeand's objections to Anderson's attorney's fees are overruled.  The Court finds the fees sought both reasonable and necessary in light of the circumstances.  Despite the modest

---

[7] For example, Anderson's attorneys filed (1) a motion for contempt against McKeand and other defendants when they failed to comply with the Court's preliminary injunction, (2) a motion for sanctions when McKeand alleged that Walker & Patterson had committed barratry, (3) a motion to compel in order to obtain responsive documents in discovery, (4) a response to McKeand's demand for a jury trial, and (5) responses to McKeand's multiple motions for summary judgment.  (ECF No. 72 at 3-4).

damages, the fees were commensurate with the complexity and contentiousness of this case.  In

total, Anderson is awarded $30,643.07 for attorney's fees and expenses.

**Conclusion**

The Court will issue a Judgment consistent with this Memorandum Opinion.

SIGNED **March 17, 2017.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE